ALEX G. GOETHEL SHEET METAL WORKS COMPANY, Respondent, vs. AMERICAN LACE PAPER COMPANY, Appellant.

*November 7—December 5, 1933.*

250

For the appellant there was a brief by *Olwell & Brady* of Milwaukee, and oral argument by *Bernard V. Brady*.

For the respondent there was a brief by *Nohl, Nohl, Petrie & Blume* of Milwaukee, and oral argument by *Henry M. Blume*.

FAIRCHILD, J.   If there is credible evidence to support the findings of the jury, the judgment must be affirmed.   So our inquiry is directed to that point.   The respondent proposed to erect a paper-pot dryer according to certain plans and specifications for a stipulated sum and agreed when in operation the capacity of the dryer would be approximately 6,000 pots in ten hours.   Certain material was to be furnished by appellant, and concerning this feature of the agreement there is no dispute.   Under the agreement as disclosed in the statement of facts, the respondent undertook the installation of the dryer.   On March 24, 1930, it had the dryer installed

in the form of an inclosed tunnel constructed of sheet metal fifty-four feet long, about fourteen feet wide, and six feet high, designed to accommodate two rows of eight trucks each. The doors to the dryer were double, each being about six feet high by four feet wide, to accommodate the passing of the trucks. There were guide rails to which forks in the ends of the trucks fitted, the purpose of which was to keep the trucks properly centered. The paper pots rested on perforated trays fitted on racks of the trucks, permitting the forced circulation of hot air by electrical fans so as to evaporate the moisture from the pots and discharge it from the dryer. In order to meet the requirements of the contract, it would be necessary to dry approximately 2,000 pots in three and one-third hours. The trucks were designed to carry 1,920 pots.

If the appellant expressly made known to the respondent the particular purpose for which the goods were required and relied on the respondent's skill and promise to furnish the article, there was a warranty that the goods would be reasonably fit for such purpose. Sec. 121.15, Stats. The evidence affords no opportunity for controversy over the proposition that the appellant did advise respondent of, and that respondent understood, the purpose for which the equipment was required. We consider it established without contradiction that a dryer was to be furnished which would properly dry paper pots to the number of 6,000 in ten hours, that the dryer would have to fit the dimensions of the room in which it was located, and accommodate the rack trucks which appellant was building for the purpose of carrying the pots, and that the respondent undertook to meet those conditions. It also appears that about the middle of April the respondent claimed the dryer was ready for operation, and on April 24, 1930, the first test was made by loading the dryer with pots of assorted sizes. Scale weights were taken as the pots were put into the dryer and the dryer operated for three and one-

third hours by the respondent. The actual scale weights were taken of the pots when removed from the dryer. Some of the larger pots were warped and many of the smaller ones were "wet and quite soggy at the bottom." The appellant insisted, and the respondent apparently agreed, that the tests showed the dryer inadequate for the drying of such a load, but the respondent contended then that this failure was due to the fact that the sizes of the pots were mixed and insisted upon a test at which only pots of the single size No. 600 would be used, and that all should be of the same color. This request was acceded to by the appellant and the respondent made another test on May 6th with the No. 600 size pots. The actual weights of the pots were taken before placing them in the dryer where they remained for three hours and thirty-five minutes, were then taken out and weighed again. It was claimed by the appellant that this test showed that the dryer was not satisfactory and that about one-third of the pots were warped. Following this, further changes in the apparatus were made and the dryer operated until about May 29, 1930, when it appears that both parties were of the opinion that further changes would have to be made because of the failure of the dryer to meet the requirements agreed upon. On June 4, 1930, appellant addressed the following letter to the respondent:

"We understand that you want to make extensive changes on your dryer which will put this machine out of operation from Friday morning until about Wednesday afternoon.

"This is to notify you that we are willing to allow you to put this machine out of operation for this time.

"However, as we informed you before, we are very badly handicapped in this department on account of the failure of this machine to perform and when you put it out of operation entirely you practically paralyze this department. We therefore notify you that while we are willing to allow you to tie the machine up for this length of time that it is the last time which we will permit this.

"Our busy season for this line is rapidly approaching and we have reached the point where we must either have this machine put into operating condition immediately or taken out of the building to make room for a new dryer.

"We hope that your alterations will solve the trouble as we need the dryer badly. Should the dryer still fail to perform after you make these changes, we will ask that you effect an immediate settlement of the entire matter so that we may replace it at once."

By the actions of the respondent after the receipt of the letter of June 4th there appears to be an acquiescence in or acknowledgment of the facts therein stated, for following the receipt of this letter, as testified to by the president of the respondent, changes were made. He said:

"We found that the floor, the surroundings of the dryer were absolutely wet, wringing wet. We thought it advisable then instead of taking the air from the inside to make a new connection to the dryer with outside air and that would eliminate all of that moisture being absorbed and put back into the dryer. For that reason we asked to make the change, which we did. That was the change which was made. That was the last change which was made."

Following the making of the change just referred to, the appellant, on June 19, 1930, addressed a letter to the respondent a portion of which was received in evidence and reads as follows:

"After observing the operation of the dryer during the last two days we are sorry to advise you that your efforts to make it operate satisfactorily have not been successful. . . . We hereby notify you to remove this dryer from our premises at once or make some other disposal. . . . Will you please advise us of your intentions not later than June 20th so that we can make arrangements for a new dryer."

The president of the respondent was of the opinion that after making the change of June 4th, the dryer operated fifteen per cent. better as far as time of drying was concerned.

A demonstration showing the ability of the dryer properly to care for at least 2,000 pots of the No. 600 size was never made. Appellant claimed a thirty-eight per cent. efficiency was all that was ever attained. Acceptance by appellant was conditioned upon an approximate efficiency of one hundred per cent. There was a contract for the building of a machine with a party professing special skill and judgment upon which reliance was placed for performance. It was the expectation of appellant that the machine would approach the standard of production stipulated for. A warranty existed. Each test showed a complete failure or was so conducted as to be useless as evidence upon the issue under investigation. While there was still hope of respondent's success in developing a dryer, both parties recognized their mutual obligations. The failure of each succeeding effort caused the appellant to protest, and each time respondent attempted by changes in theory of air movement from pressure method to vacuum, by change in motors and in fans, in source of air supply, to accomplish the hoped-for result, and during this time respondent never made a claim that the dryer worked satisfactorily.

There can be no question under the circumstances but that sufficient time was allowed respondent to comply with the specifications or show its inability to do so. There is no evidence to sustain a finding that the machine was ever capable of performing to the capacity stipulated for. After the letter of June 4th, efforts were again made by respondent to improve the dryer, but the evidence contained in the record not only fails to sustain a finding that respondent was able to get a proper result, but it warrants the conclusion that the appellant's claim of unsatisfactory performance was justified and acceded to by respondent. On June 13th representatives of respondent tried the dryer to a limited extent, but the notice to appellant did not afford an opportunity to provide a full load or to take accurate weights of such pots as were

used. The engineer of respondent testified concerning this as follows:

"Well, the computation may have been made on the side of the dryer or on pieces of paper, various different places. We did not keep any particular record of them because we were not dealing with the American Lace Paper. I was up here just as a favor to Mr. Goethel to try to get the thing in operation, consequently we did not keep any recorded tests of what we were doing there."

This leaves the case without evidence of satisfactory operation of the machine on June 13th. The burden of showing the machine of a character and capacity stipulated for is upon respondent, and without meeting it, it cannot be heard to claim that the machine was satisfactory.

The April tests showed the dryer insufficient. Following the test of May 6th respondent made changes and tried them out in experimental operations. This course of conduct continued. The appellant wrote more letters than respondent did, but after each test and trial when appellant notified respondent of the failure of the machine to meet its needs, no denial was made, but in recognition of the failure further changes were made with the consent of the appellant, until the end of June. The tests made in which both parties joined showed failure to produce a machine of the standard required. The operation of June 13th on which respondent relies was not intended to be in connection with appellant. The testimony of Mr. Gardner quoted above controls this aspect of the case. The appellant in its operation of the machine found it much below the efficiency desired and it repeatedly so informed respondent. Under the circumstances, had the machine been capable of handling the desired number of pots in the time limited, at any time, it was incumbent upon respondent to have asserted that fact when denied by appellant. Respondent is precluded from proceeding as the evidence shows it did here, and then, when litigation arises, making broad claims of efficiency for its machine,

On June 13th respondent had its engineer go from Chicago to Milwaukee, as he says, "as a favor . . . to try to get the thing in operation. . . ." Evidence is lacking on which to base a finding that as constructed the dryer was capable of drying 2,000 pots of No. 600 size in three and one-third hours. The implication by silence on which appellant is presumed to have acted amounts in fact to an admission of the existence of defects in the dryer and is as strong evidence of that as if respondent had verbally responded to the objections of appellant, admitting the failure of the machine to meet the requirements of the contract. On June 26th appellant wrote a letter which was not received by the trial court, but which contained evidence clearly competent, relevant, and material, in which it was said:

"Since your latest efforts to better the operation of the dryer, after changing it back again, have wholly failed, . . . we renew our order to you to remove this machine from our plant, and we demand that you begin dismantling and removing within two days from receipt of this notice. . . ."

To that letter respondent through its attorney said:

"Our client informs us that you have taken the position that no further work is to be done by them in completing the dryer. . . . There has been a failure of co-operation on your part in the construction and handling of this equipment, and the requirements now made by you are not the requirements upon which the contract was predicated. . . . It appears further that you have refused to allow our client to make the necessary tests and to make such adjustments as these tests may disclose, if any, since the change was made within the last few days under your authorization. . . . No completion date is specified in the contract."

From a review of all the evidence the only inference that can reasonably be drawn is that the respondent failed in its efforts to meet its obligations under the contract. The testimony given by the president of respondent and its engineer does not raise a conflict with the controlling admissions by respondent and the evidence of failure on its part. Mr. Gard-

ner, the engineer, gave his opinion in answer to a hypothetical question as to what might be accomplished by this dryer, and it is sought by this testimony to show adequate drying of pots in the number required by the contract. We do not deem it necessary to enter into an analysis of this particular testimony. He was present at the test on June 13th. If the machine was adequate to discharge the work it was calculated for, it would have been possible to have had an actual demonstration. The hypothetical question submitted does not square with the conditions stipulated for, and is therefore without sufficient force to establish any essential facts. The testimony of an expert not based on contract conditions cannot be a substitute for evidence of performance.

*By the Court.*—Judgment reversed. Cause remanded with directions to dismiss the complaint.